[Civ. No. 11953. Second Appellate District, Division One.—February 29, 1940.]

MELVILLE ADAMS, Appellant, v. Dr. WILLIAM A. BOYCE et al., Respondents.

Melville Adams, *in pro. per.*, for Appellant.

W. I. Gilbert, Elber H. Tilson, Gibson Dunn & Crutcher and Philip C. Sterry for Respondents.

WHITE, J.—This is an appeal by plaintiff from a judgment of nonsuit in an action for alleged malpractice and assault and battery on the part of several doctors and a hospital. It is claimed that by reason of the alleged negligent acts of the defendants plaintiff lost the sight of his right eye.

The second amended complaint attempts to set up seven causes of action. The seventh cause of action relates to all defendants, and as to the other causes of action, the first has reference to the defendant hospital; the second to defendant doctors Boyce and Rogers; the third to defendant hospital and defendant doctors just mentioned; the fourth to the two defendant doctors Irvine; the fifth to defendant Dr. Blaine, and the sixth to defendant Dr. Judson. The cause was tried before the court sitting with a jury. At the conclusion of the plaintiff's case the court granted a nonsuit as to all defendants, and from the judgment entered thereon plaintiff prosecutes this appeal.

Clarity in disposing of the points raised on this appeal will be aided by here presenting an epitome of plaintiff's case as the same is revealed by the record. On the morning of November 27, 1935, while constructing an addition to his home at Venice in the county of Los Angeles, plaintiff was attempting to separate two 2x4's which were nailed together. In this process he was using a carpenter's wrecking bar upon which he was hammering with a hammer, while holding the bar across his thighs. Suddenly he felt something strike his right eye with a resultant severe burning pain lasting for approximately a half hour. He then looked into a mirror and observed a small red spot in the extreme right corner of his eye. Plaintiff then went to Santa Monica, where he had three X-rays of his injured eye taken by Miss Frances Davis. That same afternoon he consulted Dr. Carl H. Bal-

lard, who examined the eye and attempted to secure from a hospital, the latter not being a party to this action, the use of what is termed a "giant magnet", used for withdrawing foreign objects such as steel from the eye without further injury thereto. Permission to use the magnet was refused by the hospital in question because Dr. Ballard was not a member of the staff of such hospital. The following day plaintiff attempted to obtain treatment at the General Hospital of Los Angeles County, at which institution plaintiff's eye was X-rayed by defendant Dr. H. A. Judson, and where plaintiff first met defendant Dr. Boyce, with whom he talked concerning his injury and the treatment thereof. Refused admittance to the County Hospital for treatment, plaintiff claims that upon recommendation of defendant Dr. Boyce he went to defendant California Hospital on November 29th and was admitted as a patient. Plaintiff further contends that at the time of his admission to the California Hospital he was asked by the admitting nurse if he "had a doctor" or "knew any doctors", to which he replied that he had met defendant Dr. Boyce that morning at the General Hospital and inquired of the admitting nurse if she "knew anything about Dr. Boyce", to which it is claimed the hospital attendant replied, "Dr. Boyce is on our staff and he is one of the best eye doctors in the city"; whereupon plaintiff states he said, "I am leaving it—I am looking to you to get the best doctor available to do what I want done here". Plaintiff further contends that shortly thereafter he was advised by the admitting nurse that she had tried to talk to Dr. Boyce, but that the latter was out, whereupon plaintiff himself left the hospital for lunch, returning about 1 o'clock, at which time the admitting nurse called defendant Dr. Boyce on the phone and handed the phone to plaintiff, at which time plaintiff contends defendant Dr. Boyce said, "I am going to handle your case— you get a room . . . and as soon as they have located the foreign body I will come over . . . and operate on you."

Being then assigned to a room, plaintiff contends he went to the room and to bed, where he remained until about 3 o'clock, at which time defendant Dr. Boyce talked to plaintiff on the telephone, saying, "I understand they have not diagnosed the foreign body yet. If they don't take care of you or X-ray you within twenty minutes, you can put on your clothes and come down to my office." After waiting

some twenty minutes, appellant went to defendant Dr. Boyce's office in the Roosevelt Building, and was by such doctor taken to defendant Dr. Blaine's office in the same building, and X-ray pictures were taken by the last-named doctor.

It further appears from plaintiff's testimony that he returned to the defendant hospital after Dr. Boyce had told him that he would "be over there at five o'clock to operate on you". Taken to the operating room, where two nurses were present with defendant doctors Boyce and Rogers, plaintiff in describing the operation states that "Dr. Rogers washed around the area of his eye and covered his left eye with a bandage; that Dr. Boyce stuck something in both his upper and lower lids; . . . that Dr. Boyce held a pair of scissors up above appellant's eye; that about that time a nurse entered, telling Dr. Boyce that Dr. Blaine wanted to talk to him on the telephone; that Dr. Boyce went to the telephone and came back, saying, 'Fourteen millimeters, that checks with the county.'" Appellant further testified concerning the operation: "I felt a twisting motion on my side and all of a sudden there was a give and it seemed like he pushed something in my eye. All the time my eye was looking straight up. He then asked the nurse for the magnet and the nurse lifted the magnet up onto the operating table. . . . then I could hear a humming sound; . . . it didn't vary as though there was any movement of the magnet; pretty soon Dr. Boyce says, 'I can't find it, and it isn't magnetic.' I then stated to Dr. Boyce and Dr. Rogers that the steel chip hit the eye way over on one side; that the first redness appeared over on the side and that the X-rays showed it way over on the side. . . . and that Dr. Ballard had told me that he thought it was way over in the skin, on the outside of the eye . . . They stood there looking at me for a minute and then Dr. Boyce asked the nurse for something and he squeezed something into my eye and wiped it out, put a patch on, and I was taken down to my room."

The operation proper was described by defendant Dr. Boyce as follows:

"After the eye was anesthetized the conjunctiva was picked up approximately over this foreign body and was dissected back over this foreign body, exposing this sclera—that is that dense solid membrane, the sclera. Then a little opening was made in the wall of the eye with a cataract knife, just a tiny

little opening, and then the magnet was put up against this opening and the current turned on. That was done at least a dozen times and no foreign body came. And then after I saw that the magnet was not going to pull the foreign body, I took a tiny little pair of iris scissors— . . . '' (The scissors and a knife with which the incision was made were then exhibited.) ''The incision was just as wide as that little knife. . . . The cataract knife . . . a cataract knife. Then after we could not get the foreign body with the magnet—it seemed to be non-magnetic, wouldn't come to the magnet—I introduced the tip end of a little pair of scissors about four millimeters— that would make it just about that far'' (indicating) ''into approximately where this foreign body was, getting it close. I did that in preference to putting the tip of the magnet, because the magnet is a great big thing and would have enlarged the wound. I used the scissors, because the scissors are the best type of steel; and by putting the scissors into that little opening, almost in contact with the foreign body, then putting up the magnet—touching the magnet on that, on the scissors . . . somewhere on the scissors. I don't remember the exact spot.''

Subsequently, on the morning of December 2d, defendant Dr. Boyce brought plaintiff to defendant doctors Irvine's office, where the latter two doctors looked into plaintiff's eye with an ophthalmoscope and saw the foreign body still within the eye. On the following Thursday plaintiff's eye was swollen shut, whereupon he went to defendant Dr. Boyce, who, according to plaintiff, looked in the latter's eye without an instrument and said, ''My God, something's happened. You have panophthalmitis,'' and suggested that plaintiff go to a local hospital for injection of foreign protein and then keep hot applications on his eye two hours on and one off for ten days. Plaintiff further testified that Dr. Boyce stated he could do no more for plaintiff and that the latter should ''go to Santa Monica and get taken care of locally''. It is alleged by plaintiff that by reason of the negligence of the defendants in the performance of the operation in question there ensued ''an irritation of the tissues and an infection in said eyeball and eye which resulted in an inflammation of said eyeball and eye and panophthalmitis, and iritis, and other injuries'', culminating in ''the total loss and destruction of the use and sight of his said right eye and seriously endan-

gered plaintiff's left eye so that for several months plaintiff was threatened with total blindness''.

As to the correctness of the court's order granting a nonsuit in favor of defendant Dr. H. A. Judson, there can be no question, because the record is barren of any evidence proving or even tending to prove negligence on his part. The only testimony as to Dr. Judson is that he took X-ray pictures of plaintiff's eye at the General Hospital, and there is no showing that in the taking of said pictures Dr. Judson was careless, negligent or unskilful in any way. Further, there is no evidence whatever that such X-ray pictures were at any time used by any of the physicians in the treatment rendered or for diagnostic purposes, or in fact for any purpose whatever.

Equally bereft is the record of any evidence of negligence, carelessness or lack of skill on the part of defendant Dr. Edward S. Blaine. At the request of the operating surgeon, Dr. Boyce, the defendant Dr. Blaine took certain X-ray pictures of appellant's injured eye for the purpose of localizing the foreign body therein. Subsequent to the taking of such pictures the defendant Dr. Blaine reported to Dr. Boyce the location of the foreign body in appellant's eye as disclosed by the X-ray pictures. When defendant doctors Boyce and Rogers operated on appellant's eye in an attempt to remove the foreign body therefrom, after penetrating the eyeball the foreign body was disclosed as being in approximately the position stated in Dr. Blaine's localization report. As to defendant Dr. Blaine, the nonsuit was properly granted.

What we have just said with reference to the absence of any showing of negligence, carelessness or unskilfulness concerning defendant doctors Judson and Blaine is equally applicable to the situation as it concerns defendant doctors A. Ray and Rodman Irvine. As to these defendants it appears that on the evening of November 27th appellant called Dr. A. Ray Irvine on the telephone and asked for an appointment. After some discussion of appellant's ailment, an appointment was made for the following morning at the Eye and Ear Hospital, which appointment appellant did not keep. On December 2d, appellant visited Drs. Irvine at their office in company with defendant Dr. Boyce, who had theretofore told Dr. A. Ray Irvine of the former's attempt to remove a foreign body from appellant's eye. On this occasion Dr. A.

Ray Irvine looked into appellant's eye with an opthalmoscope and saw a foreign body in the eye. Dr. Rodman Irvine also examined the eye on this occasion. During this examination a small magnet was held beside appellant's eye, and the elder Dr. Irvine said, referring to the foreign object in the eye, when he applied the magnet, "It didn't move." Thereafter defendant doctors Irvine advised Dr. Boyce that "If you could not get it out with a magnet and it was not magnetic, we do not advise further surgery." In the light of what we have heretofore said and shall hereafter say, it is at once apparent that the diagnosis and expression of opinion by the doctors Irvine did not constitute malpractice, and it was the duty of the court to grant a nonsuit as to such defendants.

■ The law on the subject of the care and skill required of physicians in the treatment of patients is well settled, and was epitomized in the case of *Hesler* v. *California Hospital Co.*, 178 Cal. 764, 767 [174 Pac. 654], where it was said that the law requires of the physician only "first, that he shall have the degree of learning and skill ordinarily possessed by physicians of good standing practicing in that locality, and, second, that he shall exercise reasonable and ordinary care and diligence in treating the patient and in applying such learning and skill to the case. The law takes cognizance of human weakness and liability to err in the application of skill and learning, and it requires only the exercise of reasonable and ordinary care and diligence to avoid error."

Concerning the obligations assumed by a physician when he undertakes to treat a patient, it is said in the same case at page 766:

" 'A physician and surgeon, by taking charge of a case, impliedly represents that he possesses, and the law places upon him the duty of possessing that reasonable degree of learning and skill that is ordinarily possessed by physicians and surgeons in the locality where he practices, and which is ordinarily regarded by those conversant with the employment as necessary to qualify him to engage in the business of practicing medicine and surgery. Upon consenting to treat a patient, it becomes his duty to use reasonable care and diligence in the exercise of his skill and the application of his learning to accomplish the purpose for which he was employed. He is under the further obligation to use his best judgment in exercising his skill and applying his knowledge.'

(*Pike* v. *Honsinger,* 155 N. Y. (201), 209 [63 Am. St. Rep. 655, 49 N. E. (760), 762].) 'The difficulties and uncertainties in the practice of medicine and surgery are such that no practitioner can be required to guarantee results, and all the law demands is that he bring and apply to the case in hand that degree of skill, care, knowledge, and attention ordinarily possessed and exercised by practitioners of the medical profession under like circumstances.' (*Zoterell* v. *Repp,* 187 Mich. (319), 330 [153 N. W. (692) 695].) 'It is never enough to show that he has not treated his patient in that mode, nor used those measures, which in the opinion of others, even medical men, the case required; because such evidence tends to prove errors of judgment, for which the defendant is not responsible as much as the want of reasonable care and skill, for which he may be responsible.' (*Leighton* v. *Sargent,* 27 N. H. (460), 474 [59 Am. Dec. 388].)''

The case before us is not of that type discussed in *Thomsen* v. *Burgeson,* 26 Cal. App. (2d) 235 [79 Pac. (2d) 136], where during the performance of the surgical or other skilled operation an ulterior act or omission occurs, the judgment of which does not require scientific opinion to throw light upon the subject.

■ With these rules in mind, we now turn to a consideration of the claimed liability of defendant doctors William A. Boyce, John Brady Rogers, and defendant Lutheran Hospital Society of Southern California, operator of the California Hospital. It is the contention of appellant that he went to the hospital and sought medical aid to have only certain things done, viz., the foreign body removed from his eye by the use of a "giant magnet". However, we think the evidence indicates that appellant placed himself under the professional care of these physicians for the purpose of having the foreign body removed from his eye. The operating doctors did use the magnet, but it proved ineffective in their effort to dislodge the object from the eye, whereupon they resorted to surgery. Appellant predicates his action on the theory of negligent diagnosis on the part of defendant doctors, claiming there was error in locating the position of the foreign object and error in the determination that it was not magnetic. Assuming that the record presented a case of mistaken diagnosis, it is totally lacking in any incidents of carelessness or unskilfulness necessary to constitute actionable negligence.

When due care, diligence, judgment and skill are exercised, a mere failure to diagnose correctly does not render a physician liable. ▪ In the present case, however, we are impressed with the fact that a mistake in diagnosis was not proved. It has been held in this state that the implied contract on the part of the physician is that he possesses that reasonable degree of learning and skill possessed by others of his profession, and that he will exercise reasonable and ordinary care and skill in the application of that learning to accomplish the purpose for which he is employed. (*Houghton* v. *Dickson*, 29 Cal. App. 321 [155 Pac. 128].) As to what is or is not the proper practice in a case such as this is uniformly a question for experts and can be established only by their testimony. (*Perkins* v. *Trueblood*, 180 Cal. 437, 443 [181 Pac. 642] ; *Houghton* v. *Dickson, supra.*) In the case before us there was no expert testimony as to the diagnosis being incorrect, nor as to what method or means in the exercise of ordinary care and skill, other than that used by the operating physicians, should have been employed in an attempt to remove the foreign body from the eye of appellant.

▪ As to respondent Lutheran Hospital Society, nowhere in the record is our attention directed to any evidence other than that the agreement between appellant and the hospital contemplated that the former was to receive the usual and ordinary services rendered a patient, while the testimony points unerringly to the fact that the treatment accorded appellant by the hospital was entirely consistent with ordinary skill and care. There is no merit in appellant's claim that the services of the operating surgeon, Dr. Boyce, were furnished and provided by respondent hospital. Appellant met Dr. Boyce at the County General Hospital before he entered respondent hospital, and he it was who first mentioned Dr. Boyce at the hospital, at which time the attendant there stated that the doctor was a member of the staff of the hospital and was highly regarded in his profession. ▪ What we have hereinbefore said disposes of appellant's claim that he was the victim of assault and battery. By word and action appellant submitted himself to the professional care of respondents for the purpose of having the foreign body removed from his eye, and the operation performed with that end in view was with his consent.

■ The doctrine of *res ipsa loquitur* is not applicable to the facts of this case, and before plaintiff can recover he must show by expert testimony that the defendants failed to use the degree of care and skill ordinarily exercised by other surgeons in this community.

■ We have carefully examined the record, .and find therein no prejudicial errors in the rulings of the trial court in connection with the admission or rejection of evidence. Such rulings were in accord with the law as hereinbefore stated applicable to cases of this character.

The judgment is affirmed.

York, P. J., and Doran, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on March 25, 1940, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 29, 1940.